Filed 2/23/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PAM PIPITONE,<br><br>　　　Plaintiff and Appellant,<br><br>　　　　　v.<br><br>DON WILLIAMS et al.,<br><br>　　　Defendants and Respondents. | H041468<br>(Monterey County<br>Super. Ct. No. M114411) |

This action arises from the murder of Ryann Bunnell, the daughter of plaintiff and appellant Pam Pipitone. Ryann was killed by her husband, Jesse Crow, who later killed himself in jail while awaiting murder charges.[1] Defendants and respondents Deane Crow, M.D. and Don Williams, M.D. separately saw and treated Ryann several months before her death for injuries she sustained when Jesse ran over her foot with his truck. At the time, Ryann did not reveal the true origin of her injury to Dr. Crow or Dr. Williams.

Pipitone brought this wrongful death action against Dr. Crow and Dr. Williams for failure to report alleged, suspected abuse to the authorities as required by Penal Code section 11160. The trial court granted respondents' separate motions for summary judgment, each on the independent grounds of duty and causation. The court also granted Dr. Williams' motion on a third ground, the affirmative defense of equitable estoppel.

---

[1] Although it is generally accepted that Jesse Crow killed Ryann Bunnell, we note that his suicide came before he could be tried and found guilty beyond a reasonable doubt.

Pipitone appeals from the court's entry of summary judgment against her. She argues that she raised triable issues of fact as to duty and causation.

We conclude that the trial court correctly found no triable issue of fact as to both elements of duty and causation, for both respondents. Because breach of duty and causation are necessary elements of a wrongful death action predicated on alleged violations of Penal Code section 11160, we will affirm the judgments in favor of Dr. Williams and Dr. Crow.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Defendants' Medical Treatment of Ryann and the Circumstances of Her Murder

Ryann Bunnell began dating Jessie Crow in July 2009 and they married the following month. It was only about six months later that Jesse brutally murdered Ryann, and with the assistance of several other individuals,[3] dismembered her and dumped her body parts into the San Francisco Bay.

Dr. Crow is a retired physician and the father of Jesse Crow. Dr. Crow was aware that Jesse had a history of fights and arrests, at least one involving brandishing a gun on the highway; he had hired a lawyer for his son as a result of such incidents. Dr. Crow met Ryann for the first time after the couple married and saw her fewer than 10 times before her death. One of those occasions took place in the early hours of the morning of October 23, 2009 when Dr. Crow received a phone call from his son. The call woke Dr. Crow. Jesse asked his dad to come to his house because Ryann was injured.

---

[2] For purposes of this background we only include facts properly in the record. We note that Pipitone failed to limit the factual summary in her opening brief "to matters in the record" and further failed to support factual references "by a citation to the volume *and page number* of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(2)(C), 8.204 (a)(1)(C), italics added.)

[3] The "others" who helped Jesse dispose of Ryann's body after the murder are named in a separate cause of action in the underlying complaint but are not parties to this appeal.

Dr. Crow arrived about five minutes later. Ryann was sitting on the couch and in apparent pain. Both Jesse and Ryann were noticeably intoxicated. Ryann complained of an ankle or foot injury and told Dr. Crow that she had been run over by a truck. Ryann or Jesse also conveyed that she had been injured when she tried to climb into Jesse's truck and fell down as he was backing up.

Dr. Crow briefly examined Ryann and noted abrasions on her foot, ankle, and shoulder. He did not ask Ryann anything else about how she had been injured but suspected that she might have a broken bone. Dr. Crow left for his house and returned to bring Ryann over-the-counter pain medication. Between the two visits, Dr. Crow spent approximately 10 minutes with Ryann. He did not advise Ryann about seeking further medical care.

That same morning, Dr. Crow's wife went to Jesse's house and arranged for Ryann to see Dr. Williams. Dr. Williams is an orthopedic surgeon in private practice. About 10 years earlier, Dr. Williams had employed Dr. Crow's wife as a radiology technician. He remained friendly with the Crows and saw them occasionally through their professional network. He had known Jesse when Jesse was a teenager. Dr. Williams did not personally know Ryann.

On October 23, 2009, Ryann, accompanied by Jesse, received treatment at Dr. William's medical office. Ryann told Dr. Williams that a truck had run over her foot but that she and Jesse were drunk at the time and did not get the license plate or know the identity of the driver. Dr. Williams' examination confirmed a potential hairline fracture in Ryann's right foot, as well as bruises and abrasions to her foot, leg and hip, and a possible partial ligament tear in her left knee. Ryann's injuries were consistent with her report of the accident. Though Ryann was alone with Dr. Williams and his staff for part of the exam, during the x-ray, Ryann did not offer more details about the accident or suggest that she was a victim of abuse. Nor did Dr. Williams probe further.

3

Dr. Williams suggested a cast boot and did not see Ryann again, though a week later he prescribed her Valium over the phone.

Several days after Ryann's treatment by Doctors Crow and Williams, Pipitone learned from her other daughter, Ryann's sister, that Jesse had run over Ryann's foot. Pipitone thought that Jesse should pay Ryann $5,000 toward her medical bills and lost earnings. Ryann conveyed the idea to Jesse, who purportedly agreed provided that they sign a contract stating the truck incident was an accident. A hand-written agreement was drafted, stating in relevant part that on October 23, 2009 Jesse "accidentally hit" Ryann with his vehicle, and instead of going to court for damages, both parties had agreed on payment of $5,000 by Jesse to Ryann "to cover the costs incurred as a result of the accident." Jesse, with contribution from Dr. Crow, paid Ryann. Pipitone signed the agreement as a witness.

The same day that Pipitone witnessed the agreement framing the truck incident as an accident, Pipitone took Ryann to the hospital emergency room for her foot. Pipitone hoped that Ryann would report the incident to the hospital staff during the health history intake.[4] Pipitone was present while Ryann responded to the health history questions, but Ryann did not report the abuse.

After other abusive acts perpetrated by Jesse, and notwithstanding the "agreement," Pipitone called the police to report that Jesse had "broken Ryann's leg" and that Ryann was suffering abuse and was afraid. Ryann's sister made similar reports to the police. On December 23, 2009, an officer with the Salinas Police Department, Patrick Haney, dispatched to interview Ryann. In his deposition, Officer Haney testified that Ryann was not cooperative during the interview. Ryann admitted that her husband had deliberately run over her and that it took place in Monterey. She admitted that she

---

[4] Piptone is a licensed vocational nurse who had been employed at the hospital. She knew that the health history process would provide Ryann a chance to disclose abuse.

felt threatened by her husband, that he had "guns and a lot of illegal things" and would come after her and her family if she said anything. She did not want to give the officer details and indicated she did not want to talk with law enforcement. Officer Haney gave Ryann a resource pamphlet for domestic violence victims. He forwarded his report to the Monterey Police Department and Monterey County Sheriff's Department. No further police intervention occurred.

On February 2, 2009, Ryann's family reported her missing. Her murder took place on or about January 30, 2009.

## B. *Pipitone's Wrongful Death Action*

Pipitone brings this civil action as the sole surviving heir of the decedent. In the second cause of action of the complaint, Pipitone alleges that Dr. Crow treated Ryann for injuries from the truck incident, including a fracture of the right foot and numerous open and obvious bruises, abrasions, cuts and swelling to her right leg and foot. She alleges that Dr. Crow knew or should have known that Ryann's injuries were the result of assaultive or abusive conduct because of his "knowledge of violent behavior on part of Jessie[5] Crow in the past, the nature of the injuries, and/or because of information received as to the cause of the injuries," and that he failed to make a report to law enforcement in violation of Penal Code section 11160. She also alleges that he "undertook a confidential relationship" with his son to protect Jesse from the consequences of his domestic violence and to conceal the nature of the domestic violence incident. In the third cause of action, Pipitone alleges that Dr. Crow's conduct in failing to make a report to law enforcement was willful and intentional.

In the fourth and fifth causes of action of the complaint, Pipitone brings identical allegations against Dr. Williams but argues that the "confidential relationship" was

---

[5] The spelling of names varies across the complaint and other documents in the record. Jesse Crow is alternately spelled "Jessie" Crow; Ryann Bunnell is alternately spelled "Ryan" Bunnell or referred to as "Ryan Crow."

5

between Dr. Williams and Dr. Crow and/or Jesse Crow. She also alleges that Dr. Williams' knowledge of the cause of the injury was "because of Defendant Dean Crow's knowledge of violent behavior on part of Jessie Crow in the past, the nature of the injuries, and/or because of information received as to the cause of the injuries."

Both respondents answered the complaint and generally denied the allegations.

## B. Summary Judgment Proceedings

### 1. Dr. Williams' Motion for Summary Judgment

Dr. Williams moved for summary judgment on three grounds: (1) no breach of any duty by Dr. Williams; (2) assuming liability, no causation; and (3) Pipitone's wrongful conduct facilitating a paid arrangement to cover up the abuse that she asserted Dr. Williams should have discovered and reported estopped her from asserting claims against him.

In support of the motion, Dr. Williams submitted his declaration,[6] Pipitone's responses to requests for admission, and deposition testimony of witnesses. These included: Pipitone; members of Dr. Williams' office staff; nursing staff at Salinas Valley Memorial Hospital; and Officer Haney, who interviewed Ryann in December 2009. Dr. Williams argued that Pipitone could not establish breach of any mandatory duty because there was no evidence that Dr. Williams knew or reasonably suspected that Ryann was a victim of domestic abuse. Even if evidence existed to establish duty, Dr. Williams argued there could be no causation because Pipitone herself reported the same abuse to the police and the subsequent investigation did not change the ultimate, terrible outcome.

---

[6] While the motion was pending, Dr. Williams filed an errata and amended declaration ostensibly correcting the record as to whether he knew that Dr. Crow also had tended to Ryann's injury.

6

## 2. *Dr. Crow's Motion for Summary Judgment*

Dr. Crow moved for summary judgment, or in the alternative, summary adjudication of the two causes of action filed against him. He argued that there was no mandatory duty to report the alleged domestic violence because the night he saw Ryann for her injuries he was acting as a parent and not in his professional medical capacity, and because there was no evidence that he knew or reasonably suspected domestic violence. Dr. Crow also argued that Pipitone could offer no evidence that a mandatory reporting failure was the proximate cause of Ryann's death because many intervening events, dependent on discretionary acts, took place in the time that transpired between Dr. Crow's treatment of Ryann and her murder. In support of his motion, Dr. Crow proffered his own deposition testimony, Pipitone's deposition testimony, that of a Salinas Valley Memorial Hospital nurse, and that of Officer Haney.

## 3. *Pipitone's Opposition to Respondents' Motions*

Pipitone filed a joint response to the memoranda of points and authorities of Dr. Williams and Dr. Crow, and a separate response to each separate statement of facts. In addition to Penal Code section 11160, Pipitone argued that the action against Doctors Crow and Williams was predicated upon Penal Code section 11161.[7] In her opposition, Pipitone argued that there were triable issues of fact as to whether each doctor should reasonably have suspected that Ryann's injuries resulted from domestic violence, and that by failing to offer expert testimony in support of the motions for summary judgment, Doctors Crow and Williams could not meet their initial burdens on the issue of duty. Pipitone also argued that a failure to exercise due care was presumptively established under Evidence Code section 669.[8]

---

[7] Pipitone's complaint does not allege a violation of Penal Code section 11161, only Penal Code section 11160.

[8] Evidence Code section 669, subdivision (a) establishes a rebuttable presumption that a person failed to exercise due care if that person: (1) violated a statute, ordinance, or

7

Pipitone argued that the causal link between non-intervention in a domestic violence situation and escalating violence had been definitively established. In support of both arguments, Pipitone submitted the expert declaration of Linda Barnard, Ph.D (Barnard Declaration), a marriage family therapist and doctor of counselor education specializing in domestic violence and related trauma issues.

Dr. Barnard's curriculum vitae referenced extensive experience as a presenter and expert witness in the domestic violence field. In her declaration, Dr. Barnard stated that she "reviewed and considered" the deposition transcripts of both doctors and the statements attributed to them. Dr. Barnard opined generally that the mandatory reporting provisions establish a minimum standard of care for health care providers, that without intervention violence "usually escalates in both frequency and severity resulting in repeat visits to healthcare systems or death," and that health care providers serve as "'gatekeepers'" to identity and report abuse where family members and the abused themselves may not. Such reports by trained professionals "tend to receive more attention from those in a position to act upon the report."

Dr. Barnard also opined that each doctor "had or should have had at least a reasonable suspicion that the incident of on or about October 22, 2009 was assaultive or abusive conduct." With regard to Dr. Crow, this included that he "knew the injury was suffered by an instrumentality controlled by [Ryann's] husband" and that he had made statements "evidencing a knowledge of violent propensities on the part of Jessie Crow." With regard to Dr. Williams, this included that he knew the descriptions of the truck incident "provided by the husband and wife were inconsistent and lacking in detail" and he "knew that Jessie [*sic*] mother provided x-ray services, and thought it was odd they did

regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

8

not go to his mother for those services." Dr. Barnard further opined that the failure of Dr. Crow and Dr. Williams to report the information to law enforcement "increased the risk of injury to Ryann Bunnell by way of assault and/or battery to an unusual degree," that "the murder of Ryann Bunnell is directly related to the failure to report the incident of on or about October 22, 2009," and that compliance with the mandatory reporting sections of the Penal Code "would more likely than not have prevented the murder of Ryann Bunnell."

Further in support of her opposition, Pipitone presented varying accounts, from deposition testimony and other statements taken in the case, of each respondent's treatment of Ryann and familiarity with the circumstances of her injuries. For example, she cited various versions of Dr. Crow's visit with Ryann and Jesse on October 23, 2009 which, taken together, appear to present consistency and credibility issues. First, Pipitone cited Dr. Crow's interviews with law enforcement during the murder investigation, as recounted in the declaration of Ryan McGuirk, Supervising Investigator with the Monterey County District Attorney's Office (McGuirk Declaration). Next Pipitone offered a summary contained in correspondence from Dr. Crow's former counsel to plaintiff's counsel, as well as a statement by Dr. Crow's former counsel in opposition to a motion to compel. Pipitone also submitted excerpts of Dr. Crow's deposition testimony in which his responses pertaining to the morning after the truck incident appear fractured and convoluted. Finally, Pipitone submitted the declaration of Ryann's sister, Rochelle Bunnell (Bunnell Declaration), in which Ms. Bunnell described her visit to see Ryann that same morning and her observations of Dr. Crow. Pipitone also presented varying accounts of Dr. Crow's actions in relation to the $5,000 payoff.

Similarly with respect to Dr. Williams, Pipitone pointed to inconsistencies between Dr. Williams' deposition testimony, his declaration submitted in support of the motion for summary judgment, and the recorded statement that he provided during the murder investigation, as recounted in the McGuirk Declaration.

9

**4.** *Objections to Pipitone's Evidence*

Dr. Williams and Dr. Crow each objected to large portions of Pipitone's evidentiary submissions, many of which the trial court sustained. Pipitone did not contest the objections at the trial court hearing or raise the trial court's evidentiary rulings in the present appeal. To the extent that the exclusion of certain evidence is pertinent to our discussion below, we summarize those objections and the trial court's rulings.

**a.** *Barnard Declaration*

Both respondents objected to the expert declaration of Linda Barnard, Ph.D, in its entirety as well as to numerous paragraphs therein. The objections may be summarized as follows. As a marriage and family counselor with a Ph.D in counselor education, Dr. Barnard was not qualified to render opinions on the standard of care applicable to medical doctors presented with a foot injury. The opinions lacked foundation and were not based on matters upon which an expert would ordinarily rely. The opinions were highly speculative and conclusory, failing to provide a basis in reasoned explanation or verifiable facts. The trial court separately sustained Dr. Williams and Dr. Crow's objections to the entire Barnard Declaration.

**b.** *Pipitone Declaration*

Dr. Crow objected to several paragraphs of the declaration of appellant offered in support of her opposition to the motions for summary judgment on the grounds of hearsay without exception and improper lay opinion. For example, in reference to Pipitone's conversations with her daughter and Jesse Crow on the morning of October 23, 2009, immediately after the truck incident, she stated in paragraph 9: "I asked [Ryann] if the police came and Ryann said they were not called because she did not get a license plate number," and in paragraph 15: "I asked Jesse Crow why he did not take Ryann to the hospital and he said because his dad was an emergency room doctor. 'My dad always fixes us up.' " In paragraph 26, in reference to the $5,000 payment scheme, Pipitone stated: "Jesse then said that 'My dad will only give half the money

10

unless there is a contract and he (Dr. Crow) wants it to say it was an accident.' " The trial court sustained these and all of the objections to the Pipitone declaration.

### c. *Bunnell Declaration*

Dr. Crow objected to numerous paragraphs of the declaration of Rochelle Bunnell on the same grounds as to the Pipitone Declaration. Most pertinent here are Ms. Bunnell's observations from the morning of October 23, 2009, when she went to the house around 8:00 a.m. to check on her sister:

"Dr. Crow went to examine Ryann and lifted her bandage. Dr. Crow indicated her leg was not broken but her foot was. Dr. Crow asked Ryann if she was in pain and Ryann said 'yes.' He then glared at Jessie, shaking his head side to side. Dr. Crow also told Jessie to call Dr. Williams, telling Jessie that Dr. Williams will get you in and take X-rays. Based upon the words and manner of the statements, I understood this as confirmation that Dr. Crow was aware of a prior communication with Dr. Williams. Dr. Williams was described as a friend of the Crows. [¶] . . . [¶] "It appeared to me that Jesse and Dr. Crow had discussed earlier what to do."

In paragraph 27, Ms. Bunnell described what she heard from Ryann about the $5,000 payment:

"Ryann told me that our mom and dad were helping her move out and that our mom and dad wanted Jesse to pay $5,000 for medical bills and missed work. Ryann indicated Jesse would only agree if it was put in writing that her injuries were caused by an accident. Ryann told me that Dr. Crow had come by and paid $2,500 of the agreed upon amount of $5,000. Ryann also told me that Dr. Crow and Jesse wanted a contract written before they would give her the rest of the $5,000."

The trial court sustained these and all of the objections to the Bunnell declaration.

### d. *McGuirk Declaration*

Dr. Crow also objected to portions of the declaration of Ryan McGuirk, supervising investigator with the Monterey County District Attorney's Office, in which

11

McGuirk described two interviews taken during the murder investigation. In paragraph 6, McGuirk stated:

"During the course of the investigation, in an interview taken on January 30, 2010, Dr. Crow told law enforcement that at the time of the prior truck injury incident, he was at home with his wife, Jessie Crow arrived at their home in an excited state and said they had to follow him back to his house. He told law enforcement in that interview that both he and his wife followed Jesse back to Jessie's house and upon entering they found Jessie and Ryann in a screaming argument. He said at one point that he had no idea why they were arguing and at another point both were accusing of stalking each other. He said no one appeared hurt. He said he did not want to be involved so he just left."

Also in paragraph 6, McGuirk stated:

"On February 4, 2010, Dr. Crow was again interviewed by law enforcement, this time in a recorded interview. I was the primary interviewer. In that recorded interview he was asked about his son Jessie Crow. About his son, he told law enforcement that it was typical for Jessie to get agitated and that he had 'episodes' of agitation. He told them that 'if something doesn't go right, he becomes quite vicious and fights.' He also confirmed that Jessie "gets angry on a whim.""

Dr. Crow objected to these statements on the grounds of hearsay without exception, improper lay opinion, lack of personal knowledge, and that the asserted "beliefs, opinions and conclusions" are not competent evidence. The trial court sustained these objections.

### 5. *Trial Court's Ruling on the Motions*

After a joint hearing, the trial court granted both motions for summary judgment. In its order on Dr. Crow's motion, the court did not specify the grounds for granting the motion. At the hearing, the court had indicated that it found Dr. Crow to be acting as a parent, and not in his capacity as a physician, and that even if there was a duty to act, the court found no triable issues of fact as to causation.

12

As to Dr. Williams, the court determined first that Pipitone had not put forth admissible evidence raising a triable issue of fact on the element of duty. That is, "Dr. Williams was not presented with any history, clinical information, or ascertainable injury that would oblige him to suspect, and correspondingly, report spousal abuse." Second, the court determined that the evidence was insufficient to create a triable question of fact as to causation: "There was no causal nexus between Dr. Williams' conduct and the absence of a report of spousal abuse: Spousal abuse was, in fact, reported and investigated by law enforcement personnel during the lifetime of Plaintiff's Decedent." Third, the court determined that Pipitone was barred from proceeding with her causes of action against Dr. Williams under the doctrine of estoppel.

DISCUSSION

## A. *Standard of Review*

A trial court properly grants a motion for summary judgment when there is no triable issue of material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c.) A triable issue of fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)

A defendant moving for summary judgment must show either that the plaintiff " ' "has not established, and cannot reasonably expect to establish," ' " the elements of his or her cause of action," or that there is a complete defense to that cause of action. (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705 (*Ennabe*), quoting *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-11018; Code Civ. Proc., § 437c, subd. (p)(2).) Support for the motion must take the form of evidence, including affidavits, declarations, admissions, and depositions. (Code Civ. Proc., § 437c, subd. (b).) Once the defendant makes this initial showing, the burden shifts to the plaintiff to set forth "specific facts" beyond the pleadings that show a triable issue of one

13

or more material facts as to the cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review a motion for summary judgment de novo. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717 (*Wilson*).) We consider only the facts that were properly before the trial court when it ruled on the motion and apply the same three-step analysis as the trial court: first we "identify the issues framed by the pleadings;" next we "determine whether the moving party's showing has satisfied his burden of proof and justifies a judgment in movant's favor;" and finally we "determine whether the opposition demonstrates the existence of a triable issue of material fact." (*Inter Mountain Mortg., Inc. v. Sulimen* (2000) 78 Cal.App.4th 1434, 1439, quoting *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601-1602.) In doing so, we liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wilson, supra*, 42 Cal.4th at p.716-717; *Ennabe, supra,* 58 Cal.4th 697, 705.)

## B. *Issues Framed by the Pleadings*

Pipitone asserts that she presented evidence sufficient to create a triable issue of fact that each doctor knew or reasonably suspected the true nature of Ryann's injuries on October 23, 2009, breached his duty to report pursuant to Penal Code section 11160 or Penal Code section 11161, and that this breach directly contributed to Ryann's death. As a preliminary matter, we find that Pipitone's failure to identify Penal Code section 11161 in her complaint did not preclude her from raising it as a source of duty in her opposition to the motions for summary judgment.

In relevant part, Penal Code section 11160 mandates a report to law enforcement "immediately or as soon as practically possible" when any health practitioner, acting in his or her professional capacity or within the scope of employment, provides medical services for a patient "whom he or she knows or reasonably suspects" is "suffering from any wound or other physical injury … where the injury is the result of assaultive or

14

abusive conduct." Penal Code section 11161 imposes the identical duty and applies more broadly to "every physician or surgeon who has under his or her charge or care any person" suffering from injuries inflicted in the manner described in section 11160. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 407 (*Landeros*).) The facts pleaded in Pipitone's complaint were sufficient to put Dr. Crow on notice of the allegations against him regardless of whether his alleged duty arose out of Penal Code section 11160 or Penal Code 11161.[9] Further to the point, as we will explain in detail below, under neither statutory section has Pipitone met her burden to demonstrate a triable issue of material fact.

## C. *Evidentiary Issues*

Respondents urge that we review the trial court's evidentiary rulings for abuse of discretion. Dr. Crow moreover argues that Pipitone waived any appeal of the evidentiary rulings by failing to challenge those rulings in her opening brief. Dr. Crow and Dr. Williams also criticize Pipitone's unqualified discussion in her appellate brief of evidence that the trial court had excluded, including the expert declaration of Dr. Barnard.

Pipitone replies that the proper standard is de novo review of the trial court's evidentiary rulings, and that her evidentiary showing is "sufficiently strong" without the expert declaration (and, presumably, other evidence to which the trial court sustained objections). We consider both evidentiary issues: (1) by what standard do we review the trial court's evidentiary rulings on summary judgment; and (2) did Pipitone waive any challenge to the excluded evidence?

---

[9] At the summary judgment hearing, Pipitone's counsel requested to amend the plaintiff's complaint "to the extent that the trial court doesn't find that we factually alleged [Penal Code section 11161], even though we didn't cite the particular code section." The trial court accepted the argument and noted Penal Code section 11161, alongside Penal Code section 11160, in its oral findings.

As to the standard of review, we look to the California Supreme Court for guidance. In *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 (*Reid*), the court addressed the proper treatment on appeal of a trial court's failure to rule on evidentiary objections when adjudicating a summary judgment. In the context of resolving that issue, the appellate court in *Reid* had deemed it proper to review the evidentiary objections on the merits: " 'Because summary judgment is decided entirely on the papers, and presents only a question of law, it affords very few occasions, if any, for truly discretionary rulings on questions of evidence. Nor is the trial court often, if ever, in a better position than a reviewing court to weigh the discretionary factors.' " (*Id.* at p. 535 [quoting the opinion of the appellate court].)

The Supreme Court agreed with the appellate court that application of a de novo review standard was appropriate under the particular circumstances of the case but refrained from deciding "generally" which standard of review applies to a trial court's rulings on evidentiary objections based only on the papers in summary judgment proceedings. (*Reid*, 50 Cal.4th at p. 535.) Even though the Court did not foreclose application of the abuse of discretion standard, we interpret *Reid*'s practical effect on review of a summary judgment, in which evidentiary issues, and all issues, are decided on papers alone, to be the application of de novo review.[10]

---

**10** To the extent that appellate courts have continued to review for abuse of discretion a trial court's rulings on evidentiary objections based on the papers in summary judgment proceedings (see, e.g., *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 951 [reviewing evidentiary objections on summary judgment for abuse of discretion and citing other courts of appeal that did the same]), we diverge and adhere to the reasoning set forth in *Reid*.

16

Here, unlike in *Reid*, the trial court ruled on respondents' evidentiary objections. Because the rulings were determined on the papers and based on questions of law such as hearsay, we find that de novo review is proper in this context.[11]

As to whether we refrain from considering evidence to which the trial court sustained objections, which rulings the appellant has not directly challenged on appeal,[12] we refer to our earlier decision in *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686 (*Mamou*). There we explained that it is not the role of the appellate court to "grant conclusive effect to the trial court's treatment of the evidence before it, however patently erroneous that treatment may be." (*Id.* at p. 711.) Quite the opposite: "if a party's position depends on inadmissible evidence admitted over a proper objection," or conversely if a party was prejudiced by the exclusion of admissible evidence, "a reviewing court would be empowered, and indeed obliged, to acknowledge the error" and review the evidence. (*Ibid.*) Though it is often stated that " '[w]e must "consider [] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained" ' " (*ibid.*, quoting *Reeves v. Safeway* (2004) 121 Cal.App.4th 95, 106-107 & *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334), we conclude that a more accurate statement of our review of a summary

---

**11** A more recent California Supreme Court decision regarding a pretrial evidentiary challenge to expert testimony is also instructive. In *Sargon Enterprises, Inc. v. University of Southern Cal.* (2012) 55 Cal.4th 747, 773, the court held that in the context of pretrial proceedings, the trial court's ruling excluding expert testimony is reviewed for abuse of discretion "[e]xcept to the extent the trial court bases its ruling on a conclusion of law."

**12** There is no question that Pipitone's opening brief on appeal should have denoted which evidence in her moving papers had been excluded based on objections sustained by the trial court. Even so, each respondent has had the opportunity to address his objections raised and sustained below, and we consider the issue of the evidentiary rulings to be properly before this court as part and parcel of the appeals from the summary judgments.

judgment is that we consider all the evidence set forth in the moving and opposition papers except that to which objections have been made and *properly* sustained.[13]

We therefore do not accept the argument that because Pipitone failed to expressly challenge the trial court's evidentiary rulings excluding portions of the declarations and the entirety of Pipitone's expert report, we must defer to those rulings without considering whether the trial court's exclusion of potentially material evidence was proper.

### D. Summary Judgment was Proper as to Both Dr. Crow and Dr. Williams

#### 1. Dr. Crow's Statutory Duty to Report Suspected Abuse

Several factors must be in place in order to trigger a physician's mandatory reporting duty under Penal Code section 11160. Dr. Crow's motion for summary judgment focused on two of these factors: (1) the physician must be "acting in his or her professional capacity or within the scope of employment" when providing medical services for a patient, and (2) he must "know[] or reasonably suspect[]" the patient's injury is the result of assault or abuse. (Pen. Code, § 11160, subd. (a).) Even for a physician acting outside of his professional capacity or scope of employment, the second factor is a prerequisite to trigger the mandatory reporting duty. (Pen. Code, § 11161.) Penal Code section 11162.5, subdivision (d) defines whether a physician "[r]easonably suspects" abuse to mean "that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or her training and experience, to suspect."

In support of his motion on the element of duty, Dr. Crow presented deposition testimony from his and Ms. Pipitone's depositions, neither of which reference evidence

---

[13] Indeed, as we explained in *Mamou*, the common refrain from *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334 (on appeal from a summary judgment "[w]e must 'consider [] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained' ") has "proven to be among the more mischievous dicta in recent history." (*Mamou*, 165 Cal.App.4th 686, 711.)

18

or mention facts that suggest that at the time of the October 23, 2009, middle-of-the-night house call to his son's house, he could have suspected, let alone knew, that Ryann's foot injury was caused by Jesse's intentional assault or abuse. Dr. Crow relied on the same deposition testimony to argue that he acted solely in his capacity as a parent, and therefore did not have a duty to report. Because we accept that Pipitone alleged duty under Penal Code section 11161, however, and Dr. Crow has not disputed that he was at the relevant time a physician caring for a person, we will not consider that evidence here.

In opposition, Pipitone asserted a combination of evidence, pointing to various versions of Dr. Crow's encounter with and provision of care for Ryann sometime in the early morning hours of October 23, 2009. Pipitone's showing raises consistency and credibility issues for Dr. Crow but ultimately does not identify conflicting evidence to create a triable issue of fact as to whether he entertained a suspicion of abuse. (See *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 (*Horn*) [" 'To avoid summary judgment, [appellant] "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." [Citation.]' "]; Code Civ. Proc., § 437c, subd. (e) [trial court may not deny summary judgment on grounds of credibility of witnesses furnishing declarations in support of the summary judgment].) A triable issue of fact can only be created by a conflict of evidence, not speculation or conjecture. (*Horn*, 72 Cal.App.4th at p. 807.)

For example, Dr. Crow testified in deposition that a call from Jesse in the middle of the night woke him from his sleep and that he proceeded alone to Jesse's house where he observed Ryann in her injured state and learned that she had been run over by a truck, specifically Jesse's truck, as she tried to climb in. Dr. Crow's deposition testimony also revealed that he was aware that Jesse had a history of fights and one or more violent or weapon-related altercations, and that he had hired a lawyer for his son, though he could not recall on how many occasions he had to hire a lawyer. The testimony gave no

19

indication of how close in time these incidents were to October 23, 2009 or if they ever involved intimate partner violence.[14]

Pipitone offered another version of Dr. Crow's story in the McGuirk Declaration, purportedly based on Dr. Crow's interview with police on January 30, 2010, in which Dr. Crow and his wife together followed Jesse back to the house and found Jesse and Ryann in a screaming argument where no one appeared hurt. As previously noted, the trial court sustained Dr. Crow's objections to this statement. We agree that the statement lacked personal knowledge because McGuirk merely retold what Dr. Crow "told law enforcement."

This was not the case, however, for the February 4, 2010 recorded interview in which McGuirk declared that he was the primary interviewer. According to McGuirk's declaration, in this interview Dr. Crow revealed that Jesse had "episodes" of agitation, that "if something doesn't go right, he becomes quite vicious and fights," and that Jesse "gets angry on a whim." If offered for their truth, these statements in the McGuirk Declaration were hearsay but should have been admitted under the exception for a party admission. (Evid. Code, § 1220; *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1150 [finding error in trial court's exclusion of non-party's declaration recounting a damaging statement made by a party opponent].) If offered not for its truth but to undermine the credibility of Dr. Crow's deposition testimony, it should have been admitted as non-hearsay. It remains, however, insufficient to create a triable issue of material fact. Drawing all reasonable inferences in Pipitone's favor, Dr. Crow's statement about his son may cause speculation; but it does not create conflicting evidence

---

[14] Pipitone contends that Dr. Crow admitted in deposition to knowing of another arrest in Oregon in which Jesse purportedly harassed and urinated on a woman. Pipitone provides no citation to the record, and our detailed review of the record revealed no mention of this incident. We will disregard this and other factual statements by Pipitone that lack appropriate citation to the record. (*See* Cal. Rules of Court, rule 8.204 (a)(1)(C).)

that Dr. Crow knew or reasonably suspected that Ryann's foot injury on the morning of October 23d was the result of assault or abuse.  (See Code Civ. Proc., § 437c, subd. (e); *Horn*, *supra*, 72 Cal.App.4th at p. 807.)

The same is true of another version of the story in the declaration of Rochelle Bunnell, in which Ryann told her sister not to come to the house because Dr. Crow "was handling it." Ms. Bunnell declared that she did go to the house where she observed Dr. Crow checking on Ryann's ankle, at which time Dr. Crow "glared at Jessie, shaking his head side to side."[15]  We would not have excluded the whole of what Ms. Bunnell stated she actually observed—namely that Dr. Crow was at the house around 8:00 a.m. the morning of October 23rd and that he glared at Jesse while examining Ryann's foot. Even this evidence, and the inferences reasonably drawn from it, viewed in the light most favorable to Pipitone, at best establishes that witnesses had conflicting accounts of when Dr. Crow visited the house, and that Dr. Crow directed a negative expression toward his son.[16]

Pipitone also offered the expert testimony of Dr. Linda Barnard.  Pipitone cites *Jambazian v. Borden* (1994) 25 Cal.App.4th 836 for the proposition that where Dr. Crow failed to offer expert testimony that his conduct as a practitioner met the standard of care, the "uncontradicted declaration" of Dr. Barnard was sufficient to establish the standard of care and breach.  This reliance on *Jambazian* is misplaced.  In *Jambazian*, the court of appeal affirmed a summary judgment in favor of the treating physician because the

---

[15]  While Ms. Bunnell's declaration describes Dr. Crow glaring and shaking his head at Jesse, there is no citation to the record—nor does the record reflect—Pipitone's additional contention that Dr. Crow also said to Jesse "words to the effect of 'what the fuck did you do?' " We accordingly disregard the latter, unsupported part of the statement in Pipitone's papers.

[16]  Such negative expression would not be a surprise considering Dr. Crow knew that his son was intoxicated and driving the truck that ran over Ryann's foot.

plaintiff did not offer opinion evidence to contradict the defendant's expert declarations on the standard of care of the medical community. (*Jambazian*, *supra,* at p. 844.)

Here we do not have a medical malpractice negligence case in which "expert testimony is required to establish a health care practitioner's failure to exercise the requisite degree of learning, care or skill so as to satisfy the necessary standard of care," but one in which the alleged tort arises out of a statutory violation. (See *Ewing v. Northridge Hosp. Medical Center* (2004) 120 Cal.App.4th 1289, 1302.) In the closely related context of a physician's statutory duty to report child abuse, our Supreme Court has explained that "in the event a physician does diagnose a battered child syndrome, due care includes a duty to report that fact to the authorities . . . although expert testimony on the issue of a duty to report is admissible, it is not mandatory." (*Landeros, supra,* 17 Cal.3d 399, 410, fn.8.) Similarly in *Ewing, supra,* at page 1303, footnote 7, the court of appeal drew the same distinction, noting that to prove a violation of a physician's statutory duty to report suspected cases of child abuse, a plaintiff must show "the doctor actually observed injuries and formed an opinion they were intentionally inflicted on the child. Expertise, while permissible, is not necessary." We accordingly reject the contention that expert testimony was required.

The predicate question here is whether, under the facts and circumstances put forth in opposition to summary judgment, it was "objectively reasonable" for Dr. Crow to entertain a suspicion of abuse. (Pen. Code, § 11162.5, subd. (d).) If not, then a duty to report never arose. Assuming for the sake of argument that Dr. Barnard's qualifications were sufficient to render an opinion on this issue,[17] she does not indicate on what, if any,

---

[17] Evidence Code 720, subdivision (a) sets forth the standard by which we measure if a person is qualified to testify as an expert. We agree with Dr. Crow and Dr. Williams' criticism of Dr. Barnard's qualifications to the extent that the testimony is offered to prove the medical standard of care of a physician under the reporting statute, or seeks to render a legal opinion on the purpose of the mandatory reporting statute. We are not so quick to deem her qualifications insufficient to render an opinion, however, on the impacts of health care provider mandatory reporting of domestic abuse, or on the state of

22

substantiated facts she based her opinion that Dr. Crow "had or should have had reasonable suspicion."

An expert's opinion "unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion" lacks evidentiary value and may be deemed conclusory. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*).) Viewing the evidence and all reasonably drawn inferences in the light most favorable to Pipitone (see *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843), Dr. Crow's fractured awareness of past problems on the part of his son, taken in conjunction with his knowledge that his son was driving the truck when it ran over Ryann's foot, that both Jesse and Ryann had been drinking at the time, and that her injuries were consistent with the stated mechanism of injury, do not create a reasonable suspicion of abuse any more than they might create a reasonable suspicion of reckless behavior on the part of the recently married couple. Without some reasoned explanation, the "indisputed" evidence that Dr. Barnard described does not add up to the opinion rendered. As such, it is purely conclusory. (See *Jennings*, *supra*, 114 Cal.App.4th at p. 1117.) We conclude that the trial court properly excluded Dr. Barnard's opinion as to liability.

Pipitone also argued that the $5,000 "payoff" scheme in which Dr. Crow gave Jesse $2,500 created a triable issue of fact that Dr. Crow knew that Ryann's foot injury resulted from abuse. The accusation of abuse by Pipitone and demand for payment to Ryann took place several days after the brief window on October 23d in which Ryann

---

mind of the doctors presented with Ryann's injuries. Dr. Barnard's training and experience as a marriage family therapist and counselor educator in the field of domestic violence may have imbued her with the "special knowledge, skill, experience, training, or education" in those specific areas. (*See Mann v. Cracchiolo* (1985) 38 Cal.3d 1, 38 [the determinative issue is "whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth"].) However, because we find that Dr. Barnard's opinions are inadmissible on other grounds, we need not examine her qualifications as a whole.

was under Dr. Crow's care. We conclude that it could have had no bearing on whether Dr. Crow reasonably suspected abuse within the scope of the statutory scheme.[18]

Because we find on the evidence presented that there is no triable issue of fact to indicate that at the time Dr. Crow treated Ryann, he should have known or reasonably suspected that her foot injury flowed from violence, Pipitone's allegation that Dr. Crow breached his statutory duty must fail. That being true, Pipitone cannot establish a presumed failure to exercise due care under Evidence Code section 669, which among other elements requires violation of a statute.

### 2. Dr. Williams' Statutory Duty to Report Suspected Abuse

Nor do we find any triable issues of material fact with regard to Dr. Williams' alleged duty to report known or suspected domestic violence. As discussed above, "[r]easonably suspects" is an objective standard "based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or her training and experience, to suspect." (Pen. Code, § 11162.5, subd. (d).)

In support of his motion on this point, Dr. Williams presented his declaration describing Ryann Bunnell's visit to his office on October 23, 2009 for an examination and x-ray of her foot and related injuries, the deposition testimony of Pipitone, and Pipitone's response to written discovery in which she admitted that "the patient's [Ryann] injuries were entirely consistent with her report of having had her foot run over by a lifted truck." With this combined evidence, Dr. Williams made a prima facie showing that he did not know or reasonably suspect abuse within the meaning of the statute.

In opposition, Pipitone offered Dr. Williams' deposition testimony evidencing his prior friendship with the Crow family and the fact that he knew Jesse Crow's mother was

---

[18] We read Penal Code sections 11160 and 11161 to require that the knowledge or suspicion of abuse be contemporaneous to the doctor's provision of medical services for a patient while acting in the scope of employment as a health professional (under Pen. Code, § 11160), or while the injured person is under his or her charge or care (under Pen. Code, § 11161).

an x-ray technician. She also offered the declaration of Ryan McGuirk summarizing Dr. Williams' statements in a recorded interview during the murder investigation.[19] According to McGuirk, Dr. Williams stated that he had known Jesse and Ryann before he saw her as a patient on October 23, 2009, and that "[h]e declined to say much of what he knew about Jessie, as it was difficult for him given his personal relationship with the Crows." Pipitone also offered the expert declaration of Dr. Barnard. As with Dr. Crow, Dr. Barnard opined that Dr. Williams "had or should have had at least a reasonable suspicion" of abuse, providing as her rationale the descriptions of the incident provided by Ryann and Jesse to Dr. Williams "were inconsistent and lacking in detail" and that "Dr. Williams knew that Jessie [*sic*] mother provided x-ray services, and thought it was odd they did not go to his mother for those services. The [*sic*] is evidence that he was contacted by either Dr Crow or Mrs Crow prior to treatment."

Dr. Barnard's opinion as to Dr. Williams' state of mind lacks sufficient reasoned explanation to connect what appear to be immaterial facts to her conclusion. (See *Jennings*, *supra,* 114 Cal.App.4th 1108, 1117.) Viewed in a light most favorable to Pipitone, the inconsistencies brought out by the remainder of the evidence are not material and provide no basis on which to draw a reasonable inference that Dr. Williams reasonably suspected abuse. Evidence that leads only to speculation or conjecture does not create a triable issue of fact. (See *Horn, supra*, 72 Cal.App.4th at p. 807.)

Accordingly, we conclude that there exists no triable issue of fact as to the duty element of the causes of action against Dr. Williams.

### 3. *Proximate Causation*

Our conclusions above are dispositive of the causes of action alleged against Dr. Crow and Dr. Williams. Yet if Pipitone could arguably raise a triable issue of

---

**19** The record does not reflect that Dr. Williams raised any objections to the McGuirk Declaration.

25

material fact as to the duty element for either respondent, we find that she could not do so as to causation.[20]

There are two aspects to proximate causation: cause in fact, sometimes referred to as but-for causation; and public policy considerations that are held to limit an actor's liability for the consequences of his conduct. (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352-353, rehg. den. (July 22, 2015) (*State Hospitals*).) The first aspect is determinative here. " ' "An act is a cause in fact if it is a necessary antecedent of an event." ' " (*Ibid.*, quoting *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045.) That is, a defendant whose conduct was a substantial factor in causing the plaintiff's harm "cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm; but conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (*Yanez v. Plummer* (2013) 221 Cal.App.4th 180, 187, rehg. den. (Nov. 26, 2013), review den. (Feb. 19, 2014).)

Pipitone alleges that Ryann's death, and the resulting losses that form the basis of the wrongful death action, were the proximate result of each physician's failure to report known or suspected abuse. Dr. Crow and Dr. Williams separately argue that Pipitone has not and cannot adduce evidence upon which the trier of fact can reasonably find or infer causation. Though proximate cause is generally considered a question of fact for determination by a jury, " 'where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' " (*State Hospitals, supra,* 61 Cal.4th 339, 353, quoting *Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1084.) We find this to be one such occasion.

---

[20] Pipitone's theory of proximate causation is identical as to both respondents, as are the pertinent facts. Keeping in mind that Dr. Crow and Dr. Williams each raised separate arguments in their papers, we find it most efficient to address the issue of causation together.

26

In *State Hospitals*, the California Supreme Court considered on appeal from demurrer whether an alleged breach of mandatory duties under the Sexually Violent Predators Act (SVPA) by state actors, resulting in a prison inmate's release, could be considered the proximate cause of the inmate having raped and murdered the plaintiff's decedent just four days after he paroled. (*State Hospitals*, *supra*, 61 Cal.4th at p. 343.) The plaintiff alleged that had the defendants complied with the procedure mandated by the SVPA to determine if the inmate was likely to be a sexually violent predator (SVP), that evaluation process would have resulted in a referral by the state agency for civil commitment, and ultimately civil commitment, not release. (*Id.*, at p. 346-347.) The Court reviewed a line of cases in which proximate cause was not established as a matter of law by a defendant's failure to act because the "chain of causation included discretionary determinations for which no liability could be imposed." (*Id.*, at p. 353.) One case cited in *State Hospitals* is *Fleming v. State of California* (1995) 34 Cal.App.4th 1378 (*Fleming*), in which a parolee committed murder and the victim's family alleged that the parole officer had breached a mandatory duty to arrest the killer for a parole violation. The court of appeal affirmed the dismissal, noting in relevant part that the failure to arrest "was not itself a cause of the injury, since arrest without a period of incarceration would not necessarily have prevented the crime. Incarceration, however, would have involved procedural steps involving the exercise of discretion and thus have broken the causal chain." (*Fleming, supra*, 34 Cal.App.4th at p. 1384.)

The Court in *State Hospitals* similarly concluded that the chain of intervening discretionary acts doomed the plaintiff's proximate cause allegation regarding commitment of the SVP. (*State Hospitals*, *supra*, 61 Cal.4th at p. 356 ["Plaintiff's showing of 'but for' causation is weak, because with each step in the review process the results become more speculative."].) Though decided at the pleading stage with regard to mandatory duties of government actors, the analysis in *State Hospitals* is instructive. In particular, the Court cautioned that the purpose of *cause in fact* is "to safeguard against

27

speculative and conjectural claims." (*State Hospitals*, 61 Cal.4th 339, 355.) Our analysis turns on the nature of the intervening acts that took place between the alleged breach of mandatory duty by Drs. Crow and Williams, and Ryann's murder.

In their motions, both respondents asserted evidence of an extended chain of causation that involved discretionary decisions by the police, as well as Ryann's non-cooperation in the limited police investigation that did occur. This chain included the following facts. Ryann did not reveal her abuse to the health care providers whose care she sought for her foot injury. Despite the "agreement" to frame the truck incident as an accident, about two months later Pipitone reported the incident and other abuse to the police. Ryann's sister, Rochelle Bunnell, made similar reports. In response, a Salinas police officer interviewed Pipitone and Ryann in person. Ryann told the officer that she feared Jesse and admitted that he had run over her foot with a truck, had guns and was involved with "lots of illegal things." Ryann also told the officer that she did not want a report and felt it was best if she kept her mouth shut because she was afraid Jesse would come after her and her family. Ryann accepted a pamphlet from the officer that contained information and resources for victims of domestic violence. The officer ran a warrant check on Jesse and saw that he was on probation with the condition he "obey all laws." The officer forwarded his report to two jurisdictions, the Monterey County Sheriff's Department and Monterey Police Department, but neither he nor the other departments took any further action. Over a month later, and about four months after the alleged breaches of mandatory duty, Jesse murdered Ryann.

Respondents argued that there was no evidence to suggest that had either Dr. Williams or Dr. Crow reported abuse, the outcome would have been any different. In her opposition, Pipitone did not dispute the facts outlined above but contended that there was sufficient evidence under the substantial factor test to send the issue to a jury for determination, including as to the foreseeability of Jesse's deadly intervening act. Pipitone offered only the expert declaration of Dr. Barnard to create a triable issue of

28

fact. We find, however, that Dr. Barnard's opinions on causation lack foundation, are unsupported by reasoned explanation, and are conclusory. These three opinions state:

"9. [A] failure to report the information by these health care providers to law enforcement increased the risk of injury to Ryann Bunnell by way of assault and/or battery to an unusual degree . . . .

"10. It is my further opinion that the murder of Ryann Bunnell is directly related to the failure to report the incident of on or about October 22, 2009.

"11. It is my further opinion that compliance with *Penal Code Sections 11160 and 11161*, would more likely than not have prevented the murder of Ryann Bunnell. Under the circumstances, the nature of the conduct committed in murdering Ryann Bunnell was not random nor unforeseeable; it was not the type of crime that would simply be displaced to another time or location under changed circumstances. Instead, with proper reporting, this crime would, more likely than not, not have occurred at all."

Dr. Barnard failed to indicate how she came to these profound conclusions. An expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors. (*Jennings*, *supra,* 114 Cal.App.4th 1108, 1117.) The trial court properly excluded this inadmissible evidence.

In support of her argument that a purported lack of proximate causation could not be decided as a matter of law, Pipitone also pointed to *Landeros, supra,* 17 Cal.3d 399. *Landeros* involved a doctor's failure to diagnose battered child syndrome after treating injuries from egregious physical abuse on an 11-month-old infant by the infant's mother and common law father. The medical team released the infant back to her parents, after which she suffered further injuries resulting in permanent damage. (*Id.*, at pp. 405-407.) The California Supreme Court in *Landeros* explained that because battered child syndrome included among its "distinguishing characteristics" the likelihood "that the assault on the victim is not an isolated, atypical event but part of an environmental mosaic of repeated beatings and abuse," the trial court "could not properly rule as a

29

matter of law that the defendants' negligence was not the proximate cause of plaintiff's injuries.  Plaintiff is entitled to prove by expert testimony that defendants should reasonably have foreseen that her caretakers were likely to resume their physical abuse . . . if she were returned directly to their custody." (*Id.*, at p. 412.)

Like in *State Hospitals*, *Landeros* involved a review of dismissal on a demurrer. The Court in *State Hospitals* distinguished *Landeros* and other similar cases because they did not involve "a series of discretionary determinations" that necessarily formed the basis of proximate causation.  (*State Hospitals*, 61 Cal.4th 339, 357, fn. 16.)  We find that the undisputed facts of this case are more closely analogous to those alleged in *State Hospitals*. If the child abuse perceived in *Landeros* had been reported to the authorities, it would likely have had an immediate effect on whether the infant was returned to the custody of her potential abusers.  Being that the victim was a young child, there was no conduct on her part that could have dissuaded an investigation by law enforcement.  In contrast, Pipitone has put forth no evidence that had Dr. Crow and/or Dr. Williams reported suspected abuse, a resulting investigation would more likely than not have achieved a different or better outcome than the investigation that actually took place. And like in *State Hospitals*, the inquiry by law enforcement would have been only the first step in a necessary chain of discretionary decisions by the police or sheriff's department, which would have had to culminate in the arrest and detention of Jesse.  (See *State Hospitals*, 61 Cal.4th 339, 357 [plaintiff's showing of cause in fact was "conjectural, depending on a long series of determinations that would have been required after [defendant's] breach in order for the injury to have been prevented"].)

For these reasons, we conclude that there exists no triable issue of material fact as to the element of causation with respect to either Dr. Crow or Dr. Williams.

### 3. *Equitable Estoppel Asserted by Dr. Williams*

Because we conclude that the trial court properly granted Dr. Williams' motion for summary judgment on the grounds of duty and causation, we do not reach his third contended ground of estoppel.

### DISPOSITION

The judgments in favor of Dr. Crow and Dr. Williams are affirmed. The parties shall bear their own costs on appeal.

_____

RUSHING, P.J.

WE CONCUR:


_____

PREMO, J.


_____

MÁRQUEZ, J.


*Pipitone v. Williams et al.*
**H041468**

Trial Court: Monterey County Superior Court
Superior Court No.: M114411

Trial Judge: The Honorable Thomas W. Willis

Attorneys for Plaintiff and Appellant Pam Pipitone: Roberts Elliott

James K. Roberts
Sharmi Shah

Attorneys for Defendants and Respondents Don Williams et al.: Greenfield Draa & Harrington

Tyler G. Draa
Sandra R. McIntosh
Maureen Harrington

Donahue Davies

James R. Donahue
Stephen J. Mackey

*Pipitone v. Williams et al.*
**H041468**