Filed 6/22/22  Steve Smith Enterprises v. East Side Union High School Dist. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| STEVE SMITH ENTERPRISES, INC., | H047287 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 17CV312817) |
| v. | |
| EAST SIDE UNION HIGH SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

Defendant and respondent East Side Union High School District (district) contracted with plaintiff and appellant Steve Smith Enterprises, Inc. (SSE) for assistance in obtaining reimbursement from the state for certain education costs.  SSE brought suit against the district for failing to pay contingency fees and appeals from a judgment in favor of the district, the district's governing board, and a district employee (together, defendants).  In its order granting summary judgment to defendants, the trial court concluded that SSE was not entitled to the contingency fees because the contractual condition that would obligate the district to pay them had not occurred.  On appeal, SSE asserts the trial court erred by misinterpreting the contract and by failing to consider extrinsic evidence.

For the reasons set out below, we reject SSE's claims of error and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

Steve Smith is the president of SSE, which assists schools and school districts in obtaining reimbursements for state-mandated education costs. The district is a California public high school district. In 2005, the district and SSE entered into a written contract under which SSE would assist the district in seeking reimbursement for state-mandated education costs. Before turning to the procedural history of this case, we briefly outline the law governing reimbursement of state mandates.

A. *Law Governing Reimbursement of State Mandates*

When the Legislature or any state agency requires a local government entity (such as the district) to provide a "new program or a higher level of service," the state Constitution mandates that the state provide the entity financial aid or reimbursement. (Cal. Const., art. XIII B, § 6, subd. (a) (section 6).)

To implement this directive, in 1984 the Legislature created the Commission on State Mandates (Commission) and tasked it with determining whether a local entity is constitutionally entitled to reimbursement by the state. (See *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 (*County of San Diego*); *California School Boards Assn. v. State of California* (2019) 8 Cal.5th 713, 720 (*CSBA*); *City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1807); Gov. Code, § 17525, subd. (a) [creating Commission].) As summarized by our high court, "the Legislature created a statutory procedure for determining whether a statute imposes state-mandated costs on a local agency within the meaning of section 6. (Gov. Code, § 17500 et seq.)" (*County of San Diego,* at p. 81.) "The local agency must file a test claim with the Commission, which, after a public hearing, decides whether the statute mandates a new program or increased level of service. (Gov. Code, §§ 17521, 17551, 17555.)" (*Ibid.*; see also Gov. Code,

2

§ 17521 [defining "test claim"].)  The Commission decides whether a claim by a local agency or district is entitled to be reimbursed by the state.  (*CSBA*, at p. 720.)

"If the Commission finds a claim to be reimbursable, it must determine the amount of reimbursement.  (Gov. Code, § 17557.)  The local agency must then follow certain statutory procedures to obtain reimbursement.  (Gov. Code, § 17558 et seq.)  If the Legislature refuses to appropriate money for a reimbursable mandate, the local agency may file 'an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement.'  (Gov. Code, § 17612, subd. (c).)"  (*County of San Diego*, *supra*, 15 Cal.4th at pp. 81–82.)

"If the Commission finds no reimbursable mandate, the local agency may challenge this finding by administrative mandate proceedings under section 1094.5 of the Code of Civil Procedure.  (Gov. Code, § 17559.)  Government Code section 17552 declares that these provisions 'provide the sole and exclusive procedure by which a local agency . . . may claim reimbursement for costs mandated by the state as required by Section 6.' "  (*County of San Diego*, *supra*, 15 Cal.4th at p. 82.)

B.  *Contract Between SSE and District*

In 2005, the district retained SSE to assist it in preparing and maintaining documentation regarding test claims for state reimbursement of mandated education costs.  To that end, SSE and the district executed a contract, which Smith drafted and titled "Test Claim Cost Tracking Services Contract" (some capitalization omitted) (contract).  The contract defined the "Contract Period" as May 6, 2005, through June 30, 2008.  The contract was never renewed or extended.

SSE's duties under the contract include collecting documentation associated with test claims pending before the commission and "tracking program costs."  The contract defines "test claim" as "an alleged State mandate before the Commission on State Mandates for determination whether Parameters & Guidelines have not yet been adopted by the Commission on State Mandates."  The contract does not define any other terms.

3

The district's contractual duties include "working cooperatively with [SSE] to prepare true and correct documentation to support the filing of initial reimbursement claims" and "working with [SSE] to ensure original supporting documents are maintained for three years after the date that the actual reimbursement claim is filed or last amended, whichever is later." Additionally, the provision relating to the district's duties states that "if no funds are appropriated or no payment is made to a claimant for the program for the fiscal year for which the claim is filed, original supporting documentation for the reimbursement claims shall be maintained for three years from the date of initial payment of the claim."

Paragraph No. 3 of the contract addresses payment by the district to SSE. As relevant here, the fee structure chosen by the district provides that SSE will be compensated through a "Contingency Fee of Nine Percent (9%) of paid claims, due upon payment of claims."[1] (Underlining omitted.) Additionally, the district must pay SSE an "annual Maintenance fee" of $9,000 for each fiscal year within the contract period (which the contract described as "an advance against future contingency fees owed"). The district paid SSE all the maintenance fees due under the contract, totaling $27,000.

The contract also provides that the "contingency fee options" "apply only to initial claims as defined by the State Controller's Office first set of Claiming Instructions issued for a respective program." It further states that "The contingency fee options based on filed claims or paid claims apply to both claims paid by the State as well as claim settlements reached between the State and claimants in lieu of a mandated cost claims submission." The district did not enter into any claim settlements with the state in lieu of mandated cost claim submissions during the contractual period.

---

[1] The contract included two other payment options that the district could have selected but did not. As those payment options are not germane to our analysis, we do not discuss them further. We note for context that one option was for a contingency fee of seven percent based on "claimed costs, due upon submission of claims" and the other option was an annual "fixed fee option." (Capitalization omitted.)

As explained in SSE's verified discovery responses, the contract calls for SSE to collect and maintain documentation "for potentially reimbursable mandated costs, so that if the mandated costs [were] approved for reimbursement, the District would have the information it needed to support a claim for full reimbursement and defend against any audit by the State." To that end, SSE tracked five programs that were approved for reimbursement,[2] and SSE collected "hundreds of pages for each program."

C. *Reimbursement Payments and Post-2010 School Funding Statutes*

Under the reimbursement system in place in 2005 when the parties executed the contract, the district would submit claims for reimbursement for mandated costs to the Commission. Smith testified in his deposition that when the state would reimburse a claim, it would send "a specific check for a specific claim."

Beginning in 2010, the state changed the process for satisfying its reimbursement obligations for state-mandated educational costs, transitioning from a system in which it paid individual claims for reimbursement to one in which it made annual payments to school districts from which it would offset reimbursement for state-mandated local programs. The amount of these annual payments did not depend on the number of claims for reimbursement submitted by districts (and, indeed, the annual amount would be paid, even if the district had submitted no claims at all). For example, in 2010, the Legislature passed Assembly Bill No. 1610 (2009-2010 Reg. Sess.) (Stats. 2010, ch. 724). This bill added Education Code section 41207.4, which appropriated $210,100,000 in fiscal year 2010-2011 from the general fund to the controller for allocation to districts for the purpose of offsetting the 2009-2010 outstanding balance for state-mandated local programs. (Ed. Code, § 41207.4, subd. (c).)

---

[2] Specifically, SSE tracked High School Exit Exams (Program 268), the Stull Act (Program 260), Pupil Expulsions from School (Program 271) and Graduation Requirements (Programs 295 and 297).

5

In 2014 and thereafter, the Legislature enacted a series of similar statutes that allocated funds to districts based on average daily student attendance.  (See Gov. Code, §§ 17581.8 [fiscal year 2014-2015], 17581.9 [fiscal year 2015-2016], 17581.95 [fiscal year 2016-2017], 17581.96 [fiscal year 2017-2018], 17581.97 [fiscal year 2018-2019].) "Since the 2013-2014 school year, funding for kindergarten through grade 12 school districts has been governed by a formula that establishes a minimum amount of revenue per student for each school district. . .  [T]he Legislature . . . enacted [annual funding statutes] providing one-time general state funding to school districts and other local education agencies.  Under those funding statutes, the State Superintendent of Public Instruction allocated funds essentially based on a school district's average daily attendance rate without relation to the amount of subvention[3] owed to it."  (*San Diego Unified School Dist. v. Yee* (2018) 30 Cal.App.5th 723, 727.)

These Government Code statutes (sections 17581.8, 17581.9, 17581.95, 17581.96, and 17581.97) directed that the allocated funds "shall first satisfy any outstanding claims pursuant to Section 6 of Article XIII B of the California Constitution for reimbursement of state-mandated local program costs for any fiscal year."  (Gov. Code, §§ 17581.8, subd. (c), 17581.9, subd. (d), 17581.95, subd. (d), 17581.96, subd. (c), 17581.97, subd. (d).)  The statutes also directed the State Controller's Office to apply allocations made to each school district or community college district against any "balances of unpaid claims for reimbursement of state-mandated local program costs and interest." The Controller was required to report to each school district the amounts of any claims and interest that were offset from funds provided by the statutes.  (Gov. Code, §§ 17581.8, subd. (c), 17581.9, subd. (d), 17581.95, subd. (d), 17581.96, subd. (c),

_____

3 " ' "Subvention" generally means a grant of financial aid or assistance, or a subsidy.' "  (*Redevelopment Agency v. Commission on State Mandates* (1997) 55 Cal.App.4th 976, 980, fn. 3.)  In this context, it refers to reimbursement for state-mandated programs.

6

17581.97, subd. (d).) The district received such payments pursuant to these Government Code provisions for each of the 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 fiscal years.

D. *2011, 2016 and 2017 SSE Invoices*

In 2011, SSE submitted an invoice to the district for $41,690. The invoice stated that certain of the district's claims had been "cleared/paid" by the state and therefore the nine percent contingency fee was due on them. The district paid the invoice. We discuss this invoice, which plays a central role in SSE's arguments on appeal, in further detail below.

In 2016 and 2017, SSE submitted invoices to the district seeking payment of contingency fees based on annual allocations made by the state to the district.[4] The 2016 invoice sought $3,487.41 in contingency fees related to a state-mandated program for fiscal years 1993-1994 through 1995-1996. The 2017 invoice sought $238,335.03 based on two other programs from the 1996-1997 through 1999-2000 fiscal years. The 2017 invoice included a statement that "[t]he above claims were deemed paid by the State Controller[']s Office from one[-]time mandated cost funding in the amount of $11,891,547 received by the district in [Fiscal Year] 2015/2016 (AB 93 & AB 104)."[5]

The district refused to pay SSE's 2016 and 2017 invoices. In a letter sent in April 2017, Marcus Battle (the district's then-associate superintendent of business services, whom Smith sued in his official capacity) wrote to Smith and explained the district's position. The letter essentially stated that, as the state asserted it was satisfying its mandate obligations through offsets rather than by paying mandated claims directly, the district believed it "has not been paid on the claims." Therefore, it "cannot pay the SSE invoices."

---

[4] The record on appeal does not reference any invoices sent by SSE to the district between 2012 and 2015.

[5] The 2016 invoice did not contain a similar statement.

E. *SSE's Suit Against Defendants*

SSE filed suit in 2017 for contingency fees that it alleged the district owed SSE under the contract.

The operative complaint (the first amended verified complaint for damages) alleged six causes of action against the district, the district's governing board, and Battle for (1) breach of contract, (2) anticipatory breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4) unjust enrichment, (5) common counts for services rendered, and (6) declaratory relief. SSE sought "$2,721,307.77 in contingency plus interest on $30,236,753 relevant mandate reimbursement claims that remain unfunded and/or uncleared by the [State Controller's Office]." The declaratory relief claim sought a judicial declaration that SSE was entitled to future contingency fees for funding that the district received and that "is deemed cleared."

The trial court sustained defendants' demurrer to the fourth cause of action for unjust enrichment and the fifth cause of action for common counts for services rendered, and SSE has not challenged those decisions. The trial court overruled defendants' demurrer to the breach of contract, anticipatory breach of contract, and breach of the implied covenant of good faith and fair dealing causes of action. SSE later filed a motion for summary adjudication of its declaratory relief claim, which the trial court denied.

Defendants moved for summary adjudication and/or summary judgment on SSE's remaining causes of action (breach of contract, anticipatory breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief). In connection with their motion, defendants submitted a separate statement of undisputed material facts, a request for judicial notice,[6] and the declarations of Silvia Pelayo, a finance director for the district, and Rogelio Ruiz, counsel for defendants.

_____

[6] Defendants requested the trial court take judicial notice of public reports issued by the State Controller's Office that related to the district for certain fiscal years. The

8

Pelayo stated in her declaration that, inter alia, the contract with SSE expired in 2008 and had neither been renewed nor extended. The declaration attached the contract as an exhibit, as well as a number of other exhibits. Prior to the 2014-2015 fiscal year, the district submitted claims to the commission for reimbursement for mandated costs.

According to Pelayo's declaration, beginning in the 2014-2015 fiscal year, the district received " 'one-time' monies (i.e., non-recurring revenue) on the basis of an equal amount per unit of regular average daily attendance." For example, in November 2014 the district received written notification of the allocation of one-time funds in the amount of $1,348,255 for the 2014-2015 fiscal year, based on the prior year's average daily attendance. The district also received notice from the California Department of Education that the State Controller's Office would " 'apply amounts received by each [local educational agency] . . . against any balances of unpaid claims for reimbursement of state-mandated local program costs and interest in chronological order beginning with the earliest claim.' "

The Ruiz declaration, also submitted in support of defendants' motion for summary adjudication and/or summary judgment, attached a number of exhibits, including copies of excerpts from the 2018 deposition of Smith, who had testified for SSE as the person most qualified. Smith acknowledged that he had "put the contract together." Smith confirmed that he had signed the contract on behalf of SSE, and Alan Garofalo signed on behalf of the district. Smith did not recall having any conversations with Garofalo about the terms of the contract.

When questioned at his 2018 deposition about why he "used the word 'paid claims due upon payment of claims' " in the contract, Smith responded that "At that point in time, the manner in which the state paid claims was – that was not a model they used.

trial court denied the defendants' request. Neither party has challenged that ruling; therefore, we do not consider the material attached to the request for judicial notice filed in the trial court.

9

The apportionment model is a newer thing that has happened probably in the last six years or so. At that point in time, they sent a specific check for a specific claim." He further stated that at the time he drafted the contract he "had no reason to believe the manner in which claims were paid was going to be different."

In connection with its opposition to defendants' motion, SSE responded to defendants' separate statement of disputed and undisputed facts and submitted the declarations of Smith and Evelyn Calderon-Yee. Calderon-Yee's declaration stated that she was "the Chief of the State Controller's Office Bureau of Payments, Local Government Programs and Services Division." Her declaration summarized payments made by the state to the district to reimburse it for costs associated with the five state-mandated programs on which SSE worked.

Smith's declaration attached the contract and a number of other documents, including the 2011 invoice and other SSE invoices (from 2016 and 2017), described above.

SSE submitted a declaration from its counsel attaching excerpts from the deposition of Pelayo (the district's finance director), who testified as the person most qualified from the district. Pelayo acknowledged that SSE had performed work for the district from 2005 through 2008, which the district "acknowledged" by paying the maintenance fee. Pelayo also confirmed that the district had received and paid SSE's 2011 invoice for $41,690.

Defendants replied and submitted evidentiary objections to the Smith declaration and the Calderon-Yee declaration. The trial court did not rule on those objections.

Following a hearing, in May 2019 the trial court by written order granted summary judgment to defendants. The court found that SSE was not entitled to the contingency fees requested by SSE pursuant to the plain language of the contract, specifically paragraph No. 3. The court concluded as a matter of law that SSE could not establish "that the condition precedent for payment of contingency fees 'due upon payment of

10

claims' ha[d] occurred." (Fn. omitted.) The trial court therefore found defendants were entitled to judgment in their favor as to SSE's four causes of action (breach of contract, anticipatory breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief).

The trial court entered judgment for defendants on SSE's complaint. The court ruled that defendants were entitled to recover costs, including reasonable attorney fees, "to the extent permitted by the Agreement and California law, in an amount to be set by noticed motion to, and order by, the Court."

SSE timely appealed the judgment.

## II. DISCUSSION

SSE contends the trial court erred both in its construction of the contract (including by failing to consider certain extrinsic evidence) and in its interpretation of the relevant statutory scheme. SSE argues there exist triable issues of material fact, and we must therefore reverse the judgment and the associated fee award.

A. *Summary Judgment and Standard of Review*

The purpose of summary judgment is to determine "whether, despite [the parties'] allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) "A defendant moving for summary judgment has the burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar*, [at p. 850].)" (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945 (*Jones*).)

" 'Defendants are entitled to summary judgment only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion. [Citations.] In so doing, we view the evidence in

11

the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor.' " (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605–606.)  We also review de novo the trial court's ruling on a motion for summary adjudication.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)

In conducting our independent review, we "apply the same three-step analysis as the trial court:  first we 'identify the issues framed by the pleadings;' next we 'determine whether the moving party's showing has satisfied his burden of proof and justifies a judgment in movant's favor;' and finally we 'determine whether the opposition demonstrates the existence of a triable issue of material fact.'  [Citations.]  In doing so, we liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1449 (*Pipitone*).)

The first step of the summary judgment analysis is both defined and limited by the pleadings, which " 'set the boundaries of the issues to be resolved at summary judgment.' " (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)  In the second step of our review, we examine the moving party's evidence to determine whether it has satisfied its burden of production.  (*Pipitone*, *supra*, 244 Cal.App.4th at p. 1449.)  "Typically, to meet this burden, a defendant moving for summary judgment can either negate an element of the cause of action or demonstrate a complete defense to plaintiff's claim.  [Citation.]  Only if the defendant meets its initial burden does the burden shift to the plaintiff to show a triable issue exists." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1207.)  "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, *supra*, 25 Cal.4th at p. 851.)

If the moving party has satisfied its prima facie showing, in the third step of the summary judgment analysis we consider whether the party opposing summary judgment has raised a triable issue of material fact.  Such an issue "exists 'if, and only if, the

12

evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Jones*, *supra*, 230 Cal.App.4th at p. 945.) " 'The plaintiff . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (*o*)(2).)" (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

All four of the causes of action at issue (breach of contract, anticipatory breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief) are premised on the district's contractual obligation to pay SSE contingency fees. SSE asserts it is entitled to contingency fees on all monies the state paid the district for which the state determined it had satisfied its reimbursement obligations to the district. The complaint notes, for example, that the district received one-time funds in fiscal year 2014-2015 that "cleared $38,749" of the district's mandate reimbursement claims for which SSE was entitled to contingency fees.

The breach of contract cause of action alleges that all the conditions required for SSE to receive contingency fees have occurred because the district has "[r]eceived funding for the mandate reimbursement clams at issue and the [State Controller's Office] has deemed these claims cleared." The anticipatory breach of contract cause of action alleges defendants anticipatorily breached and repudiated the contract when Battle stated the district would not pay the 2016 invoice "or future invoices for contingency fees related to mandate reimbursement [] claims for which the [d]istrict has received funding and the [State Controller's Office] has deemed cleared."

Whether the trial court erred in granting summary judgment to defendants therefore depends on the meaning of the language of the contract setting out the district's obligation to pay SSE contingency fees.

13

B. *Interpretation of the Contract*

The parties agree that paragraph No. 3 of the contract sets out the district's obligation to pay contingency fees. It provides that SSE will receive a nine percent contingency fee "of paid claims, due upon payment of claims." (Capitalization & underlining omitted.) The parties also agree that we should construe these terms by reference to ordinary usage rather than any specialized terms or definitions.

SSE asserts the contractual language, coupled with the extrinsic evidence (in the form of the 2011 invoice), reflects the parties' mutual intent that the payment triggering the obligation to pay contingency fees could take "any form." It argues the district must pay contingency fees on the offsets the state declared as reimbursements for state-mandated programs under the school funding statutes enacted in 2014 and thereafter. Defendants counter that they have not been paid "for claims" and therefore owe no contingency fees. Defendants maintain the extrinsic evidence is irrelevant to the proper interpretation of the contract.

1. Principles of Contract Interpretation

"The fundamental goal of contract interpretation is 'to give effect to the mutual intention of the parties as it existed at the time of contracting.' (Civ. Code, § 1636.) To interpret a contract, we look to its language ([Civ. Code,] § 1638) and ascertain the intent of the parties, if possible, based solely on the contract's written provisions ([Civ. Code,] § 1639). In doing so, we apply the ' "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation] . . . . Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' [Citation.] At the same time, we 'recognize[] the "interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates. (Civ. Code, § 1647.)" ' " (*Hewlett-*

14

*Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 530–531, fn. omitted (*Hewlett-Packard*).)

"It is essentially a judicial function to apply the rules of interpretation to a written contract 'so that the purposes of the instrument may be given effect.' " (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531 [quoting *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865].) "The court, at least initially, considers 'all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the "circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . ." so that the court can "place itself in the same situation in which the parties found themselves at the time of contracting." ' " (*Hewlett-Packard*, at p. 531 [quoting *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 (*Pacific Gas*)].) "Put simply, 'when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract.' " (*Hewlett-Packard*, at p. 531 [quoting *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8].)

    2. Analysis

      a. Plain Language

Paragraph No. 3 of the contract addresses the payment of contingency fees. It provides that SSE will receive from the district a contingency fee of nine percent "of paid claims, due upon payment of claims" (underlining omitted). The contract does not define "claims," "paid" or "payment." The parties do not dispute that the district's obligation to pay the contingency fees is subject to a condition precedent, although they disagree whether that condition has occurred.

SSE agrees that the contract requires that claims had to be "paid" but asserts that this condition was satisfied by the annual funding the district has received, coupled with the state's conclusion that it had "cleared" claims owed through these payments. SSE urges us to focus on the dictionary definitions of " '[p]aid' " and " '[p]ayment.' " It

15

asserts that, applying the dictionary definitions of those common terms, the contract reflects an agreement that the district was to "pay [SSE] contingency fees for the reimbursement claims paid by the State and received by the District" and demonstrates the parties' intent that the payment could take "any form."

It is true, as SSE points out, that the words " 'paid,' " " 'payment,' " and " 'pay' " carry broad meanings that can encompass the state's offset of the reimbursement obligation. For example, according to Merriam-Webster, the transitive verb "pay" has seven different definitions, including "to discharge indebtedness for: SETTLE" and to "make compensation" (Merriam-Webster Dict. Online <https://www.merriam-webster.com/dictionary/pay> [as of June 21, 2022].) The legal definition of payment is likewise broad: "An inspection of the principal dictionaries shows that the general meaning of 'payment' is the same as the [] legal meaning: the discharge of an obligation or the giving of compensation." (*Sousa v. First California Co.* (1950) 101 Cal.App.2d 533, 540.)

However, while courts routinely consult dictionaries to determine the usual and ordinary meaning of a word (see *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1499), we are also mindful that "[m]ultiple or broad meanings do not necessarily create ambiguity." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868.) "The proper question is whether the word is ambiguous in the context of *this* policy and the circumstances of *this* case." (*Ibid.*) The "reliance on common understanding of language is bedrock" but "equally important are the requirements of reasonableness and context." (*Id.* at p. 867.) Furthermore, we may not look at a contractual clause in isolation but rather we must understand a clause in connection to the contract "as a whole." (*Olson v. Doe* (2022) 12 Cal.5th 669, 680.)

Here, the contractual language reflects that the payment to the district triggering its obligation to pay SSE a contingency fee is tied to a specific mandate reimbursement claim made by the district. The contract does not simply reference "paid" or "payment"

16

but instead uses the description "paid claims."  Additionally, following the phrase "of paid claims, due upon payment of claims," the contract further states:  "The contingency fee options based on filed claims or paid claims apply to both claims paid by the State as well as claim settlements reached between the State and claimants in lieu of a mandated cost claims submission.  Interest payments for initial claims are considered a paid claim for purposes of determining contingent fees due [SSE]."

With this language, the contract discusses payment in the context of either the state making a payment based on a "mandated cost claims submission" or, alternatively, "claim settlements reached between the State and claimants."  The language further explains that a "paid claim" includes "[i]nterest payments for initial claims."  There is no language suggesting the parties contemplated another manner of payment, and the contract does not mention the words "apportionment," "offset," or claims being "cleared."  Rather, the contractual language reflects the parties' precision in expressing the scenarios that would satisfy the condition of a "paid claim."  SSE's proposed construction of the contract that payment to the district could take "any form" is inconsistent with this language and "runs contrary to the statutory preference for a construction of the contract which gives meaning to all the terms."  (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 537.)

Moreover, the contract distinguishes elsewhere between the "appropriation" of funds and the "payment" of a claim.  The provision related to the district's duties states that "if no funds are appropriated *or* no payment is made to a claimant for the program for the fiscal year for which the claim is filed, original supporting documentation for the reimbursement claims shall be maintained for three years from the date of initial payment of the claim." (Italics added.)  "[A]ppropriation" is defined as "a legislative act setting aside 'a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose.' " (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1282.)

17

This language in the contract reflects an understanding, at the time of contracting in 2005, that the "claimant" (i.e., the district) might receive funds from the state in some manner other than a paid claim tied to a specified claim submission, but the contingency fee provision does not reference any condition other than a "paid claim."

Having independently reviewed the contract, we agree with the trial court that the plain language of the contract related to the district's obligation to pay contingency fees does not extend to the district's receipt of funds sued upon here—namely, funds allotted to the district based on its student attendance figures and used to offset outstanding claims.

### b. Extrinsic Evidence

We next turn to an examination of the extrinsic evidence offered by the parties to construe the contract. "It is well settled that courts may consider extrinsic evidence insofar as it sheds light on a meaning to which the contract is reasonably susceptible. [Citation.] 'Extrinsic evidence is "admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible." ' " (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 538.) "The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms." (*Pacific Gas*, *supra*, 69 Cal.2d at p. 39.) In evaluating the evidence, the court's objective is to " 'place itself in the same situation in which the parties found themselves at the time of contracting.' " (*Id.* at p. 40.) "Extrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980 (*Cedars-Sinai*).)

We first address the defendants' contention that the contract is not "reasonably susceptible" to the interpretation urged by SSE. This contention may be dispositive because "[i]f the court decides that the language of the agreement is not reasonably

18

susceptible of the interpretation urged by the party offering it, there is no ambiguity and the extrinsic evidence is irrelevant and therefore inadmissible." (*Lockheed Martin Corp. v Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 197, disapproved on another ground in *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1036, fn. 11.)

We decide the contract is at least reasonably susceptible to the construction urged by SSE. The provision of the contract that uses the term "appropriation" does not form part of the description of the contingency fee payment but rather appears in a section detailing the district's duties in maintaining documentation for reimbursement claims. While the provision draws a distinction between when "funds are appropriated" or "no payment is made," no such similar distinction appears in the subsequent paragraph related to payment and the designated fee structure chosen by the district. Additionally, while the contract defines "test claim," it does not define other terms and contains no express limitation defining or restricting payment by the state to the district for mandated costs. Moreover, defendants rely on extrinsic evidence here (as they did in the trial court) in the form of the Smith deposition excerpts. For these reasons, we will consider extrinsic evidence to construe the meaning of the contract.

### i. Evidence

Defendants' extrinsic evidence includes excerpts from Smith's 2018 deposition describing his drafting of the contract and understanding of its terms at the time of its drafting.

SSE's extrinsic evidence offered in the trial court to support its construction of the contract included the declarations of Smith and Calderon-Yee. Defendants did not object in the trial court to the portion of the Smith declaration and exhibit related to the 2011 invoice, which we address further below. However, they did object to other portions of the Smith declaration and the Calderon-Yee declaration and renew those objections on appeal. The trial court did not rule on these evidentiary objections.

Generally, when a trial court does not rule on evidentiary objections in connection with a summary judgment motion, those objections are deemed presumptively overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.)  The burden is on the objector to renew the objection in the trial court.  (*Ibid.*)  Simply referring to the objections below does not suffice to carry that burden on appeal.  (*Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 510, fn. 1; see also *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 854.)

Based on these principles, we agree with SSE that defendants have forfeited on appeal any challenge to the Smith and Calderon-Yee declarations by failing to develop their arguments in any detail or with any supporting legal authority.  Accordingly, we have reviewed both the Smith and Calderon-Yee declarations in our consideration of the disputed contractual language.

Ultimately, however, we determine that they are largely irrelevant to the key question of the parties' intent when they executed the contract in 2005.  For example, the Calderon-Yee declaration generally describes payments made by the Controller's office to the district under various laws, but it does not shed light on what the parties mutually intended when they contracted in 2005.  Calderon-Yee does not state she or anyone at the State Controller's Office was involved with the contract between SSE and the district.  We therefore focus on the key pieces of extrinsic evidence that do relate to the parties' intent—namely the Smith deposition excerpts and the 2011 invoice.

### ii. Analysis

Smith's deposition testimony confirms that the language of the contract related to contingency fees does not encompass the method by which the state fulfilled its reimbursement obligations after 2010.  When they entered into the contract, the parties did not contemplate (and thus did not account for) the legislative changes that would fundamentally alter the method by which the state reimbursed the district for state-mandated costs.  At his deposition, Smith acknowledged that at the time the contract was executed in 2005, the state "sent a specific check for a specific claim."  In addition, he

20

"had no reason to believe the manner in which claims were paid was going to be different." This evidence supports the defendants' construction of the contract that the contingency fee payment was tied to the payment of specific claims. The parties did not contemplate in 2005 the future legislative changes and did not alter the contractual language once those changes occurred.

SSE offers the 2011 invoice, which it submitted and the district paid, as extrinsic evidence in support of its interpretation of the contract. It is well-established that "[a] party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean. For this reason, evidence of such conduct . . . is admissible to resolve ambiguities in the contract's language." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393.) "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent." (*Crestview Cemetery Ass'n v. Dieden* (1960) 54 Cal.2d 744, 754.) For example, in *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1450–1451 (*Oceanside*), the Court of Appeal determined that a borrower's payments on a loan for five years without objection in the face of periodic rate adjustments demonstrated acquiescence in the lender's interpretation of the method for calculating the interest rate adjustments.

We have reviewed and considered SSE's 2011 invoice, which the district paid in full. The 2011 invoice contains 10 line items, nine of which are dated "4/11/2006" and the last of which is dated "4/15/2010." With respect to that last line, the invoice states, "Your district AB 1610 apportionment payment dated 1/28/2011 cleared/paid some of the claims listed on your district's April 15, 2010 Acknowledgment Form. The AB 1610 payment cleared/paid $51,986 out of $138,067 (38%) in outstanding fees that were

21

detailed on this form. $27,000 in Maintenance fees had been paid as an advance against future fees due. These maintenance fees were prorated at 38% = $10,260 CREDIT ALLOCATED."

With respect to the last line item, the 2011 invoice therefore explicitly references Assembly Bill No. 1610, which in turn added Education Code section 41207.4. Education Code section 41207.4 is substantially similar to the later annual funding statutes enacted beginning in 2014 that underlie SSE's claim in this appeal to entitlement to contingency fees.

Education Code section 41207.4, which took effect in October 2010, directed the controller to "apply amounts received by each school district or community college district against any balances of unpaid claims for reimbursement of state-mandated local costs and interest in chronological order beginning with the earliest claim." (Ed. Code, § 41207.4, subd. (c).) Moreover, that statute, like the later school funding statutes, allocated and dispersed funds on the basis of regular average daily attendance for all school districts, county offices or education and charter schools. (*Id*., subd. (a)(2), (a)(4); see, e.g., Gov. Code, § 17581.8, subd. (b)(1).) Based on the substantial similarities between the relevant statutes, we reject defendants' contention that the 2011 invoice is wholly irrelevant to the parties' intent when they entered into the contract in 2005. Nevertheless, we do not agree with SSE that this invoice creates a triable issue of material fact regarding the proper construction of the contract.

We " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) Applying all presumptions in favor of SSE, we are not persuaded that the payment by the district of one invoice, made approximately six years after the contract was executed, is sufficient to create a triable issue of fact in the face of the contract's plain language and the statements made by Smith at his deposition. This single payment hardly amounts to a course of conduct; SSE does not contend the

district ever paid such a contingency fee again, let alone continuously. (See *Cedars-Sinai*, *supra*, 137 Cal.App.4th at pp. 983–984 [deeming appellant hospital's extrinsic evidence of a course of conduct involving four years of receipt of payments insufficient to support its claim it was entitled to larger payments and noting that the state had not continued to approve certain reimbursements in subsequent audits].)

Citing *Oceanside*, *supra*, 56 Cal.App.4th at page 1449, SSE contends that the 2011 invoice reflects how the parties intended their agreement to be performed, because it reflects the district paid contingency fees to SSE in 2011 "after the State began paying mandate reimbursement claims through its new appropriate-allocate-offset process but before any dispute arose." In *Oceanside*, the parties' dispute centered around the meaning of loan documents—specifically, the meaning of " 'applicable month.' " (*Id.* at p. 1447.) The court noted that the lender had consistently interpreted " 'applicable month' " (*id.* at p. 1450) for five years before the dispute arose, and that the borrower was on notice of and did not object to the lender's interpretation and, accordingly, "[borrower] may be considered to have at least acquiesced in [lender's] interpretation of the term 'applicable month.' " (*Id.* at pp. 1450–1451.)

Here, by contrast, there is no such evidence of any consistent acquiescence, let alone a course of conduct. Rather, the undisputed evidence shows the district paid one line item from one invoice and there were no further invoices until five years later (in 2016), which the district then refused to pay. This lone act is insufficient to create a material conflict in support of SSE's construction of the contract.

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. [Citations.] This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127, fn. omitted.) Having considered here the parties' extrinsic evidence,

we decide it creates no triable issue as to any material fact about the meaning of the contract. The trial court therefore properly interpreted the contract as a matter of law.

Moreover, SSE's interpretation of the contract is inconsistent with a reasonable understanding of the circumstances existing at the time the parties executed the contract in 2005 and their mutual expectations about the meaning of the payment provision.[7] As SSE's reply brief makes clear, the satisfaction of mandated reimbursements by offsets from annual funding calculated by student attendance data was "not yet invented" in 2005 and occurred "years later" after the parties entered into the contract. This acknowledgement further undercuts SSE's interpretation of the contract as the parties entered into it in 2005.

In sum, based on our independent review of the plain language of the contract and undisputed extrinsic evidence related to the construction of the contract, we decide that the district's obligation to pay contingency fees does not extend to the district's receipt of funds sued upon here—namely, funds allotted to the district based on its student attendance figures and used to offset outstanding claims. Therefore, the trial court did not err in granting summary judgment to defendants.[8]

C. *Remaining Arguments*

SSE asserts the trial court misinterpreted the "relevant statutes" both in the Education Code and Government Code. SSE defines the relevant statutes as Education

---

[7] Although defendants do not cite to it, a letter sent by Smith in January 2010 to the district (which he submitted in opposition to defendants' motion for summary judgment) further undermines SSE's interpretation on appeal of the contractual language. In the letter, Smith reiterated the plain language of the contract in his explanation that "Contractually, [the district] becomes obligated to pay [SSE's] contingency fees upon the State's payment of the mandated cost claims listed on the attached form." This language underscores that the contingency fees were tied to payments by the state of specific claims.

[8] In light of our conclusion affirming the judgment, we do not reach the district's contention that Code of Civil Procedure section 437c, subdivision (b)(3), forecloses SSE from offering the 2011 invoice into evidence.

24

Code sections 41207.4, 41207.41, 41207.42, and 41207.45, and Government Code sections 17581.8, 17581.9, 17581.95, 17581.96, and 17581.97.

SSE contends that the "[t]he [t]rial [c]ourt's interpretation of these statutes as doing something other than requiring 'payment' from the State to the District to satisfy the District's mandate reimbursement claims runs directly counter to the terms of the statutes." SSE points to the California Supreme Court's decision in *CSBA*, *supra*, 8 Cal.5th 713, contending this decision makes the trial court's statutory "error even clearer."

In *CSBA*, the California Supreme Court held the statutes did not facially violate the constitutional mandate reimbursement requirement and did not facially violate the separation of powers provision in the state Constitution. (*CSBA*, *supra*, 8 Cal.5th at p. 719.) The court observed that section 6 of the state Constitution "does not prescribe how the Legislature must provide for such reimbursement [for state-mandated costs]" and the "Legislature retains broad power to decide how best to meet the reimbursement requirement." (*Id.* at p. 726.) This broad power includes enacting "subsequent legislation for determining how an existing reimbursement obligation may be satisfied going forward." (*Id.* at p. 729.) The court concluded that the Legislature's "designation of state funding in [the two educational statutes] as 'offsetting revenues' " to pay for certain state mandate costs did not violate section 6. (*Id.* at pp. 729–730.)

Based on our independent review, we do not agree that any statutory error compels reversal of the judgment. The trial court's analysis was confined to contractual interpretation, and the court did not purport to construe the statutory scheme. Further, we do not agree that *CSBA* supports reversal here. While our high court generally described the state's mandate reimbursement process (*CSBA*, *supra*, 8 Cal.5th at p. 719), it decided a facial constitutional challenge brought by various entities related to two educational funding statutes (Education Code sections 42238.24 and 56523, subdivision (f)). (*CSBA*, at pp. 723–724.) SSE points to the high court's holding that "the method chosen by the

25

Legislature to *pay* for the two mandates does not on its face violate the state Constitution" and the "Legislature has broad authority to determine how it will *pay* for existing mandates." (*Id.* at p. 719, italics added.) This language does not address the contractual terms at issue here. While our high court used the word "pay," it did so in the context of discussing the payment for "mandates" imposed by the state and did not construe the phrase "claims paid" at issue in this appeal. Therefore, *CSBA* does not assist SSE.

SSE's remaining arguments are based on contentions we have already rejected. SSE maintains that the trial court erred in adjudicating all of SSE's four causes of action using "[e]rroneous [r]easoning" and that it erred in awarding costs and fees in the judgment (which were to be determined at a later dates).[9] SSE does not challenge the substance of the trial court's rulings other than to argue that, if we disagree with the trial court's order interpreting the contract, then we must reverse the judgment and also the award of costs and fees. Because we conclude there is no basis to reverse the judgment, we also affirm the ruling for summary judgment as disposing of all the causes of action in the operative complaint and defendants' legal entitlement to costs and fees as stated in the judgment.

## III. DISPOSITION

The judgment is affirmed. Respondents are entitled to their reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

---

[9] The costs and fees, if any, awarded by the trial court do not appear in the record on appeal.

26

_____
                                           Danner, J.


WE CONCUR:



_____
Bamattre-Manoukian, Acting P.J.




_____
Wilson, J.



**H047287**
*Steve Smith Enterprises, Inc. v. East Side Union High School District*